**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on May 3, 2018**

**UNDER SEAL**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal No. 18-1 |
| | : | |
| v. | : | Grand Jury Original |
| | : | |
| **ERNEST HALILOV** | : | 18 U.S.C. § 666(a)(2) |
| | : | (Bribery of an Agent of a Program Receiving |
| | : | Federal Funds) |
| **Defendant.** | : | |
| | : | 18 U.S.C. § 1512(b)(1) |
| | : | (Tampering with a Witness) |
| | : | |
| | : | 18 U.S.C. § 2 |
| | : | (Aiding and Abetting; Causing an Act to be |
| | : | Done) |
| | : | |
| | : | **Forfeiture:** |
| | : | 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c); |
| | : | and 21 U.S.C. § 853(p) |
| | : | |

**I N D I C T M E N T**

The Grand Jury charges that:

**Introduction**

At all times material to this Indictment:

**BACKGROUND**

1.  The United States Agency for International Development ("USAID") was an independent federal government agency that received foreign policy guidance from the Secretary of State. USAID's headquarters was located at 1300 Pennsylvania Avenue, N.W., Washington, D.C. To perform its functions, USAID worked in close partnership with private voluntary

1

organizations, indigenous organizations, universities, American and foreign businesses, international agencies, other governments, and other U.S. government agencies. USAID had working relationships with more than 3,500 American companies and over 300 U.S.-based private voluntary organizations.

2. USAID Office of the Inspector General ("USAID OIG") was an arm of USAID that provided independent oversight of USAID programs in order to promote the efficiency, effectiveness, and integrity of foreign assistance programs and operations under USAID OIG's jurisdiction, including investigations into payments and bribes in connection with procurements made with USAID grant funds.

3. NGO-1, whose identity is known to the grand jury, was an Irish non-profit, non-governmental organization ("NGO") based in Dublin, Ireland. An NGO is a nonprofit organization independent of governments and international governmental organizations, although funded by governments, which tries to improve the lives of other people through humanitarian services, among other things. NGO-1 received humanitarian foreign aid assistance funds, in part, from USAID. The assistance awards were for, among other things, the procurement of food and supplies for Syrian refugees. After receiving USAID award funds, NGO-1 would solicit bids from local vendors in Turkey for food and supplies that would ultimately be provided for the Syrian refugees. In all years relevant to this indictment, NGO-1 received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, guarantee, and other form of assistance.

4. NGO-2, whose identity is known to the grand jury, was a United States NGO based in New York, NY. NGO-2 received humanitarian foreign aid assistance funds, in part, from USAID. The assistance awards were for, among other things, the procurement of food and supplies

for the response to various humanitarian crises, including the South Sudan humanitarian crisis. After receiving USAID assistance awards, NGO-2 would solicit bids from local vendors for food and supplies that would ultimately be provided in response to various humanitarian crises. In all years relevant to this indictment, NGO-2 received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, guarantee, and other form of assistance.

5. NGO-3, whose identity is known to the grand jury, was a United States NGO based in Fairfield, CT. NGO-3 received foreign aid grant funds, in part, from the U.S. State Department. The grant was for, among other things, the provision of quality learning opportunities and safe learning environments for Syrian refugees. After receiving U.S. State Department grant funds, NGO-3 would solicit bids from local vendors for education kits, textbooks, and first aid kits that would ultimately be provided to Syrian refugees. In all years relevant to this indictment, NGO-3 received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, guarantee, and other form of assistance.

6. ERNEST HALILOV was a citizen of Turkmenistan and a former employee of NGO-1.

7. CC-1 whose identity is known to the grand jury, was a Kenyan national who worked in NGO-1's Turkish office. CC-1 was employed as a procurement manager by NGO-1. CC-1's responsibilities as a procurement manager included overseeing and reviewing tenders by vendors and recommending which tender offers would be accepted by NGO-1. CC-1 was an agent of NGO-1, and was authorized to act on behalf of NGO-1.

8. CC-2, whose identity is known to the grand jury, was a Kenyan national who worked at several NGOs, including NGO-1, NGO-2 and NGO-3, as a procurement officer, procurement coordinator, procurement manager and desk officer. CC-2's responsibilities in these

positions included overseeing and reviewing requests for quotations and tenders by vendors, developing framework agreements with vendors, and recommending which tender offers and framework agreements would be accepted by NGO-1, NGO-2 and NGO-3. CC-2 was an agent of NGO-1, NGO-2 and NGO-3, and was authorized to act on behalf of NGO-1, NGO-2 and NGO-3.

### ACTIONS TAKEN BY CC-1

9. In or about January 2016, HALILOV proposed to CC-1 that she take actions in her capacity as an agent for NGO-1 to benefit vendors affiliated with HALILOV in obtaining contracts with NGO-1 in exchange for things of value. CC-1 accepted HALILOV's offer.

10. In or about February 2016, CC-1 served as the procurement manager for NGO-1 on a contract for flour funded by USAID.

11. In or about February 2016, CC-1 provided HALILOV with confidential information about the bidding process for the flour contract in an effort to assist HALILOV's preferred vendor in obtaining the contract.

12. In or about February 2016, CC-1 signed the bid analysis for the flour contract awarding the contract to three vendors, including HALILOV's preferred vendor.

13. In or about March 2016, CC-1 served as the procurement manager for NGO-1 on a second contract for flour funded by USAID.

14. In or about March 2016, CC-1 provided HALILOV with confidential information about the bidding process for the flour contract in an effort to assist HALILOV's preferred vendors in obtaining the contract.

15. In or about March 2016, CC-1 participated in awarding the flour contract to two of HALILOV's preferred vendors.

16. Between in or about December 2015 and in or about April 2016, CC-1 provided HALILOV with confidential information regarding the bidding process for several additional contracts with NGO-1 in an effort to assist HALILOV's preferred vendors in obtaining the contracts.

## THINGS OF VALUE PROVIDED TO CC-1

17. In exchange for the actions taken by CC-1 to benefit HALILOV's preferred vendors, HALILOV provided CC-1 with things of value.

18. In or about January 2016, shortly after CC-1 accepted HALILOV's offer to take official actions in exchange for things of value, HALILOV gave CC-1 approximately 2,000 Turkish Lira, which CC-1 used to furnish her new apartment.

19. In or about February 2016, HALILOV paid for an overnight shopping trip for CC-1. HALILOV arranged for CC-1 to be picked up in a Mercedes Benz and driven to the Hilton Hotel in Mersin, Turkey, where HALILOV had purchased a room for CC-1. HALILOV then gave CC-1 a credit card, which CC-1 used to purchase approximately $1,500 worth of items. HALILOV also paid for CC-1's meals on the overnight trip.

20. In or about March 2016, shortly after CC-1 participated in awarding a flour contract with NGO-1 to two of HALILOV's preferred vendors, HALILOV instructed CC-1 to provide him with CC-1's mother's bank account information so that HALILOV could wire money to CC-1 without the money being traced directly to her. CC-1 never actually received this wire transfer from HALILOV because NGO-1 cancelled the contract before HALILOV could send the money.

## ACTIONS TAKEN BY CC-2

21. While she was an agent of NGO-1, CC-2 took actions to benefit vendors identified by and affiliated with HALILOV in connection with contract solicitations by NGO-1.

22. Between in or about 2011 and in or about 2012, CC-2 altered bid requests for contracts with NGO-1 at HALILOV's instruction to benefit HALILOV's vendors.

23. Between in or about 2011 and in or about 2012, CC-2 allowed HALILOV to select his vendor for contracts with NGO-1 for high-value contracts that CC-2 was responsible for awarding.

24. While she was an agent of NGO-3, CC-2 took actions to benefit vendors identified by and affiliated with HALILOV in connection with contract solicitations by NGO-3.

25. Between in or about 2012 and in or about 2015, CC-2 provided HALILOV with confidential information about the bidding process for several contracts in an effort to assist HALILOV's preferred vendors in obtaining the contracts.

26. While she was an agent of NGO-2, CC-2 took actions to benefit vendors identified by and affiliated with HALILOV in connection with contract solicitations by NGO-2.

27. In or about March 2016, CC-2 served as the procurement manager for NGO-2 for a framework agreement for water sanitation and hygiene items and other non-food items funded by USAID.

28. In or about March 2016, CC-2 provided HALILOV with confidential information about the bidding process for the framework agreement in an effort to assist HALILOV's preferred vendors in obtaining the contracts.

29. In or about March 2016, CC-2 edited the framework specifications created by NGO-2 for the framework agreement based on suggestions provided by HALILOV in an effort to ensure that HALILOV's preferred vendors met the framework agreement requirements.

**THINGS OF VALUE PROVIDED TO CC-2**

30. In exchange for the actions taken by CC-2 to benefit HALILOV's preferred vendors, HALILOV provided CC-2 with things of value, including money, a car, apartment furniture, electronics, and plane tickets.

**COUNT ONE**
**(Theft and Bribery in Federally Funded Programs)**

31. The Grand Jury re-alleges paragraphs 1 through 30 above as though specifically set forth herein.

32. From in or about December 2015 through in or about April 2016, defendant HALILOV did knowingly and corruptly give, offer, and agree to give things of value to an agent of an organization, intending to influence and reward the agent in connection with the business, transaction, or series of transactions of such organization involving something of value of $5,000 or more: namely, HALILOV gave, offered, and agreed to give things of value to CC-1, intending to influence and reward CC-1 in connection with actions taken by CC-1 to benefit contract bids submitted to NGO-1 by vendors identified by and affiliated with HALILOV as opportunities arose.

**(Bribery of an Agent of a Program Receiving Federal Funds in Violation of**
**18 U.S.C. § 666(a)(2))**

**COUNT TWO**
**(Theft and Bribery in Federally Funded Programs)**

33. The Grand Jury re-alleges paragraphs 1 through 30 above as though specifically set forth herein.

34. From in or about 2011 through in or about 2016, defendant HALILOV did knowingly and corruptly give, offer, and agree to give things of value to an agent of an organization, intending to influence and reward the agent in connection with the business,

transaction, or series of transactions of such organization involving something of value of $5,000 or more: namely, HALILOV gave, offered, and agreed to give things of value to CC-2, intending to influence and reward CC-2 in connection with actions taken by CC-2 to benefit contract bids submitted to NGO-1, NGO-2 and NGO-3 by vendors identified by and affiliated with HALILOV as opportunities arose.

**(Bribery of an Agent of a Program Receiving Federal Funds in Violation of 18 U.S.C. § 666(a)(2))**

## COUNT THREE
**(Tampering with a Witness)**

35. The Grand Jury re-alleges paragraphs 1 through 30 above as though specifically set forth herein.

36. In or about March 2016, HALILOV knowingly engaged in misleading conduct towards and attempted to corruptly persuade CC-2 with the intent to influence, delay and prevent the testimony of CC-2 in an official proceeding intended to be affected in the District of Columbia, that is, HALILOV directed CC-2 to delete emails between HALILOV and CC-2 and to provide a false story to USAID investigators in the event that CC-2 were ever questioned by USAID investigators about contract tenders involving HALILOV.

**(Tampering with a Witness, in violation of 18 U.S.C. § 1512(b)(2)(A)**

## COUNT FOUR
**(Tampering with a Witness)**

37. The Grand Jury re-alleges paragraphs 1 through 30 above as though specifically set forth herein.

38. In or about December 2016, HALILOV knowingly engaged in misleading conduct towards and attempted to corruptly persuade CC-2 with the intent to influence, delay and prevent

the testimony of CC-2 in an official proceeding intended to be affected in the District of Columbia, that is, HALILOV directed CC-2 to provide a false story to USAID investigators in the event that CC-2 were further questioned by USAID investigators about contract tenders involving HALILOV.

**(Tampering with a Witness, in violation of 18 U.S.C. § 1512(b)(1))**

**FORFEITURE ALLEGATION**

39. Upon conviction of any of the offenses alleged in Counts One through Four, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section § 2461(c). The United States will also seek a forfeiture money judgment against the defendant equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

40. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

(**Criminal Forfeiture,** pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 28, United Sates Code, Section 2461(c); and Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

| | |
|---|---|
| JESSIE K. LIU<br>United States Attorney<br>For the District of Columbia | SANDRA MOSER<br>Chief<br>Fraud Section,<br>Criminal Division<br>U.S. Department of Justice |
| By: _____<br>Michelle Bradford<br>Assistant United States Attorney | By: _____<br>Nathan Dimock<br>Senior Trial Attorney<br>Fraud Section<br>Criminal Division<br>U.S. Department of Justice |